# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **HARRY J. DUGAS** | **CIVIL ACTION NO. 06-0154** |
| **VS.** | **JUDGE HAIK** |
| **BURL CAIN, WARDEN** | **MAGISTRATE JUDGE METHVIN** |

### *REPORT AND RECOMMENDATION*

Before the Court is a petition for writ of *habeas corpus* filed on January 26, 2006, by *pro se* petitioner, Harry J. Dugas,  pursuant to 28 U.S.C. §2254.  Respondent, through the District Attorney for the Sixteenth Judicial District Court, St. Martin Parish, filed an answer and a memorandum in opposition to the petition.[1]  For the following reasons, it is recommended that petitioner's *habeas* claims be **DENIED AND DISMISSED WITH PREJUDICE.**

### *Factual and Procedural History*

On April 25, 1998, Helen Alexander was murdered in her home in St. Martin Parish, Louisiana.  Petitioner, Harry Dugas, made a number of inculpatory statements, including a full confession to police.  He had prior convictions for attempted murder and second degree murder. Dugas was indicted for second degree murder and was convicted of that charge on February 1, 2001, following a jury trial in the Sixteenth Judicial District Court for St. Martin Parish.[2]  He was sentenced to life in prison.

---

[1] Rec. Doc. 13.

[2] Petitioner was originally indicted with first degree murder, but the indictment was amended. Exhibit to Rec. Doc. 13 at pps. 559 and 910.

2

### *Direct Appeal*

Petitioner appealed his conviction and sentence to the Third Circuit Court of Appeals raising the following errors: (1) the trial court erred when it denied his motion to suppress his confession; (2) the trial court erred when it found that he forfeited his right to be present throughout the trial; and, (3) there was insufficient evidence to convict.  Petitioner's conviction was affirmed by the Third Circuit on June 5, 2002.  *See* <u>State of Louisiana v. Harry James Dugas</u>, No. 01-1438 (La. App. 3d Cir. 6/5/2002).[3]

Petitioner filed a *pro se* application for writs in the Louisiana Supreme Court.[4]  He argued the three assignments of error previously raised on appeal and an additional claim: that the record on appeal was incomplete because it omitted sanity commission reports which addressed petitioner's competency to stand trial.  The Louisiana Supreme Court denied relief on August 6, 2003. <u>State of Louisiana v. Harry James Dugas</u>, 2002-1787 (La. 6/6/2003), 845 So.2d 1083.

### *Application for Post-Conviction Relief*

On March 5, 2004 petitioner filed a *pro se* application for post-conviction relief in the Sixteenth Judicial District, raising the following claims for relief:

(1) ineffective assistance of counsel;

(2) Petitioner was denied his right against self incrimination when the police made promises or inducements which led to a false confession in violation of the Fifth Amendment;

---

[3] Exhibit to Rec. Doc. 13 at pps. 586-610.

[4] Exhibit to Rec. Doc. 13 at pps. 611-637.

3

(3) Petitioner's statements to the police were admitted at trial in violation of petitioner's Fifth and Fourteenth Amendment rights and in violation of his constitutional right to due process and equal protection;

(4) Petitioner was denied his due process rights and a fundamentally fair trial when the prosecutor elicited promises and commitments from prospective jurors during voir dire;

(5) Petitioner requested additional DNA testing and an independent investigation to support his claim of actual innocence; and

(6) The trial court erred in finding that petitioner had forfeited his right to be present during the trial.[5]

The trial court denied relief on July 8, 2004.[6]  Petitioner sought review in the Third

Circuit Court of Appeals, which reached the merits of petitioner's claims and denied the

application for writs, finding that:

The trial court applied the appropriate standard in determining that Relator's attorneys provided effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984).  Additionally, the admission at trial of Relator's statements to the police, Relator's forfeiture of his presence at trial, and the sufficiency of the evidence were fully litigated on appeal before this court, and are therefore precluded from review.  La. Code Crim.P. art. 930.4(A).  Relator has also failed to show articulable doubt as to his guilt that would be resolved by additional DNA testing. La. Code Crim.P. art. 926.1.  Further, there was no contemporaneous objection to the alleged prosecutorial misconduct during voir dire, thus, this claim may not be reviewed after the verdict.  La. Code Crim.P. art. 841; State v. Williams, 343 So.2d 1030 (La. 1977)." State of Louisiana v. Harry James Dugas, No. KH 04-01058 (La. App. 3 Cir. 11/3/2004).

The Supreme Court denied petitioner's application for supervisory writ on

November 28, 2005.  State ex rel. Harry J. Dugas v. State of Louisiana, 2004-3123 (La.

11/28/2005), 916 So.2d 137.

---

[5] Exhibit to Rec. Doc. 13 at pps. 662-731.

[6] Exhibit to Rec. Doc. 13 at pps. 775-779.

4

### *Issues Presented*

Petitioner challenges his conviction and sentence on the following grounds:

(1) Ineffective assistance of counsel for the following reasons: (a) counsel failed to investigate and prepare a defense to the critical aspects of the case; (b) counsel failed to investigate and prepare a defense to the false confession; (c) counsel failed to investigate and secure witnesses; (d) counsel failed to protect petitioner's "right to testify" because petitioner was forced to testify on his own behalf; (e) counsel failed to develop a meaningful relationship with petitioner; (f) counsel failed to object to petitioner's removal from the courtroom in violation of his right to confrontation; (g) counsel allowed hearsay testimony to be admitted into evidence; (h) counsel failed to secure independent experts to challenge the DNA evidence and do a proper investigation; (i) counsel was ineffective for failing to investigate petitioner's mental history and seek <u>Ake</u> funding; and, (j) counsel was ineffective for failing to seek <u>Ake</u> funds to prepare his defense and meaningful access to the courts in violation of the Sixth and Fourteenth Amendments;

(2) Petitioner was denied his right against self incrimination when police induced a false confession;

(3) Petitioner's statements were admitted into evidence in violation of petitioner's Fifth and Fourteenth Amendment rights;

(4) Petitioner was denied his Fourteenth Amendment right to due process and a fair trial when the prosecutor elicited promises from prospective jurors during voir dire;

(5) Insufficiency of the evidence;

(6) The trial court erred in finding that petitioner had forfeited his right to be present during the trial; and

(7) Petitioner requests additional DNA testing and an independent investigation to support his claim of actual innocence.[7]

Petitioner presented these issues to Louisiana's highest court and has therefore exhausted his state remedies.

---

[7] Rec. Doc. 1.  The order of the claims have been rearranged.

5

*Findings and Conclusions*

I. <u>Procedural Default</u>

The procedural default doctrine bars federal *habeas corpus* review when a state court declines to address a petitioner's federal claims because the petitioner has failed to follow a state procedural rule.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553-54, 115 L.Ed.2d 640 (1991).  "[I]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal *habeas* review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  <u>Id</u>. at 750-51.  This doctrine ensures that federal courts give proper respect to state procedural rules. <u>Id</u>.

Furthermore, the doctrine presumes that a state court's express reliance on a procedural bar functions as an independent and adequate ground in support of the judgment.  <u>Sones v. Hargett</u>, 61 F.3d 410, 416 (5th Cir.1996).  However, a petitioner can rebut this presumption by establishing that the procedural rule is not strictly or regularly followed.  <u>Moore v. Roberts</u>, 83 F.3d 699 (5th Cir.1996).  The burden is on the petitioner to show that a state did not strictly and regularly follow the procedural bar at the time pertinent to his state court action.  <u>Stokes v. Anderson</u>, 123 F.3d 840, 843 (5th Cir.1999); <u>Amos v. Scott</u>, 61 F.3d 333, 342, (5th Cir.1995); <u>Sones</u>, 61 F.3d at 416.  In bearing the burden, the petitioner must demonstrate that the state failed to apply the procedural bar to claims which are identical or similar to the claims raised by him. <u>Stokes</u>, 123 F.3d at 860; <u>Amos</u>, 61 F.3d at 340.

6

In a Memorandum Order dated March 22, 2006, the undersigned noted that "Claim 4 (voir dire) and Claim 6 (banishment from the courtroom) appear to have been procedurally defaulted because petitioner did not contemporaneously object to these claims."[8]  The Order directed plaintiff to address the procedural default doctrine with regards to Claims 4 and 6.

### *Claim 4: Voir Dire*

In the Response to the Procedural Ruling, petitioner stated:

> Petitioner responds that after careful consideration of Claim Four: (Dugas was denied his Fourteenth Amendment Right of Due Process and a Fundamentally Fair Trial whereas the prosecutor, during voir dire, elicited promises and commitments from prospective jurors), was procedurally defaulted when counsel failed to object and a claim of ineffective assistance of counsel was not raised on this issue.  And after this inmate counsel assisting Mr. Dugas spoke with him [on] April 5, 2006 at the Main Prison Law Library it was decided to submit to this court that the claim be withdrawn without prejudice to any of the remaining claims in his § 2254 petition.[9]

Considering the foregoing, it is, therefore, recommended that petitioner's claim number 4 be denied as withdrawn.

### *Claim 6: Banishment from the courtroom*

Petitioner claims that the trial court erred in removing him from the courtroom based on a finding that he had forfeited his right to be present at his trial.  This claim was argued as Assignment of Error Number 2 on direct appeal.  The Third Circuit, specifically addressed the merits of this claim, and also relied on Louisiana's contemporary objection rule, La.C.Cr.P. art. 841, to find that petitioner was precluded from raising the error on appeal.  Subsequently, the

---

[8] Rec. Doc. 4, FN. 6.

[9] Rec. Doc. 9 at p. 2.

7

Supreme Court denied writs without written reasons, and on his post conviction application, the

trial court and the Third Circuit denied the claim because it had already been addressed on

appeal.  On March 22, 2006, the undersigned issued a Memorandum Order noting that federal

*habeas corpus* review of this claim may prohibited by the procedural default doctrine.  In

response, petitioner argued that the procedural default doctrine should not be applied to this

claim, but he did not present a cause for his failure to contemporaneously object to his removal

from the courtroom or prejudice which would prevent the court from applying the procedural bar.

Louisiana Code of Criminal Procedure Art. 841 provides, "An irregularity or error cannot

be availed of after the verdict unless it was objected to at the time of occurrence."  The Louisiana

courts have consistently and uniformly applied this "contemporaneous objection rule" to bar

review of untimely evidentiary challenges.  State v. Cooks, 1997-0999 (La. 9/9/98), 720 So.2d

637, *rehearing denied, cert. denied*, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505, *rehearing*

*denied* 526 U.S. 1128, 119 S.Ct. 1789, 143 L.Ed.2d 816; State v. Nellon, 04-1253 (La .App. 5

Cir. 4/26/05), 902 So.2d 434; State v. Jones, 2003-0829 (La.App. 4 Cir. 12/15/04), 891 So.2d

760, *writ denied*, 2005-0124 (La.11/28/05) 916 So.2d 140.

Further, the United States Supreme Court has determined that the violation of a state's

contemporaneous objection rule provides sufficient grounds to support dismissal of a subsequent

federal *habeas* petition as procedurally defaulted.  Wainwright v. Sykes, 433 U.S. 72, 87, 97

S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1984).

Although the Third Circuit addressed the merits of this claim after noting the procedural

default, "[t]he rule in this circuit is that, when a state court bases its decision upon the alternative

grounds of procedural default and a rejection of the merits, a federal court must, in the absence of

8

good 'cause' and 'prejudice,' deny habeas relief because of the procedural default." Cook v. Lynaugh, 821 F.2d 1072, 1077 (5th Cir.1987); Hughes v. Dretke, 412 F.3d 582, 592 -593 (5th Cir. 2005).  The Third Circuit was the last reasoned opinion of the state courts addressing petitioner's claim, and that court invoked the petitioner's procedural default.[10]  Since it is apparent that the courts of Louisiana regularly invoke the procedural default codified in La.C.Cr.P. art. 841, federal *habeas corpus* review of this claim is prohibited by the procedural default doctrine.

In order to overcome this procedural bar, petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. at 750.

### *Cause and prejudice*

Where a state prisoner has defaulted on his federal claims in the state courts pursuant to an independent and adequate state procedural rule, he can avoid the bar of procedural default if he can show "cause for the noncompliance" with state law and "actual prejudice resulting from the alleged constitutional violation." Coleman v. Thompson, 501 U.S. at 750, quoting, Wainwright v. Sykes, 433 U.S. at 84.  Additionally, a state prisoner may demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice, that is, that the

---

[10] The Louisiana Supreme Court's subsequent one-word writ denial and the subsequent denials on post conviction are presumed to have been based upon the same procedural default identified by the Third Circuit Court of Appeals. See Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (Where there has been a reasoned state court judgment which explicitly rejects the federal claim on state procedural grounds, subsequent unexplained judgments upholding the previous judgment or rejecting the claim are presumed to rely upon the same ground.)

9

petitioner is "actually  innocent." <u>Gray v. Netherland</u>, 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d

457 (1996); <u>Murray v. Carrier</u>, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).  In such a

case, the petitioner may be excused from the application of the doctrine.

> The Supreme Court has defined what constitutes cause for a procedural default.  In

<u>Murray v. Carrier</u>, the Supreme Court explained that cause requires an impediment external to the

defense:

> [W]e think that the existence of cause for a procedural default must ordinarily turn
> on whether the prisoner can show that some objective factor external to the
> defense impeded counsel's efforts to comply with the State's procedural rule.
> Without attempting an exhaustive catalog of such objective impediments to
> compliance with a procedural rule, we note that a showing that the factual or legal
> basis for a claim was not reasonably available to counsel, or that some interference
> by officials made compliance impracticable, would constitute cause under this
> standard.

<u>Id.</u> at 488, 106 S.Ct. at 2645 (internal citations omitted)**.**  If a petitioner fails to demonstrate

cause, the court need not consider whether there is actual prejudice.  <u>Saahir v. Collins</u>, 956 F.2d

115, 118 (5th Cir. 1992).

> As discussed above, petitioner failed to present cause or prejudice concerning this error.

Petitioner has therefore failed to demonstrate cause.[11]  The court is not required to examine the

prejudice prong of cause and prejudice if petitioner has failed to demonstrate cause.  <u>Saahir,</u> 956

F.2d at 118.

### *Miscarriage of justice*

> A petitioner may alternatively avoid a procedural default by showing that it would result

in a fundamental miscarriage of justice.  In order to make the necessary showing, the petitioner

---

[11] Insofar as petitioner may argue that his ineffective counsel claim is cause for his
procedural default, that claim is without merit as discussed below.

10

must assert his actual innocence and show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 2649; 91 L.Ed.2d 397 (1986); Glover, 128 F.3d at 904. To support such an exception, the petitioner must allege that as a factual matter he did not commit the crime of conviction. Corwin v. Johnson, 150 F.3d 467, 473 (5th Cir. 1998); Ward v. Cain, 53 F.3d 106, 108 (5th Cir. 1995). The petitioner must make a "colorable showing of factual innocence." Callins v. Johnson, 89 F.3d 210, 213 (5th Cir.), cert. denied, ---U.S.---, 117 S.Ct. 530, 136 L.Ed.2d 416 (1996), quoting McClesky v. Zant, 499 U.S. 467, 495, 114 S.Ct. 1454, 1471, 113 L.Ed.2d 517 (1993).

Petitioner has not shown as a factual matter that he is actually innocent of second degree murder or that the fact that he was not allowed to be present at trial resulted in his conviction despite his innocence. Accordingly, the undersigned concludes that petitioner will not suffer a fundamental miscarriage of justice as a result of the application of the procedural bar.

Accordingly, it is recommended that petitioner's Claim No. 6 be denied and dismissed with prejudice because his claims are barred by the doctrine of procedural default.[12]

## II.    Standard of Review on the Merits

Because Dugas filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal habeas review is governed by AEDPA.

Under AEDPA, habeas relief is not available to a state prisoner on a claim which was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

---

[12]  Moreover, in the discussion below regarding the ineffective assistance of counsel as it relates to petitioner's removal from the courtroom, it is clear that the trial court did not err in removing petitioner from the courtroom.

11

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § §2254(d)(1) and (2).

Questions of law and mixed questions of law and fact are reviewed under §2254(d)(1), and questions of fact are reviewed under §2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir.2000), *cert. denied*, 532 U.S. 1039, 121 S.Ct. 2001, 149 L.Ed.2d 1004 (2001).

A state court decision is contrary to federal law within the meaning of §2254(d)(1) if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases, or the state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Under §2254(d)(2), a state court's factual findings constitute "an unreasonable application of clearly established" Supreme Court precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407-08.  The inquiry into unreasonableness is objective.  Id. at 409-10. A state court's incorrect application of clearly established Supreme Court precedent is not enough to warrant federal habeas relief – the application must also be unreasonable.  Id. at 410-12.

The state court's factual findings are presumed to be correct.  28 U.S.C. §2254(e)(1).  In order to obtain habeas relief on the §2254(d)(2) ground that the state court's decision was based

12

on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," the petitioner must rebut by clear and convincing evidence the §2254(e)(1) presumption that the state court's factual findings are correct.  *See* <u>Dowthitt v. Johnson</u>, 230 F.3d 733, 741 (5th Cir.2000).

"[U]nder the deferential standard of AEDPA, [federal courts] review only the state court's decision, not its reasoning or written opinion, to determine whether it is contrary to or a misapplication of clearly established federal law." <u>Catalan v. Cockrell</u>, 315 F.3d 491, 493 (5th Cir. 2002).

Upon review of the record and the law, the undersigned concludes that the record is sufficient, that no evidentiary hearing is required, and that petitioner is not entitled to relief.[13]

### ***Claim 1:  Ineffective assistance of counsel***

Petitioner contends that he was denied the effective assistance of counsel for several reasons.

To prevail on an ineffective assistance of counsel claim, a petitioner must establish that (1) his attorney's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052,

---

[13] Whether to hold an evidentiary hearing is now a statutorily mandated determination under 28 U.S.C. §2254(e)(2).  This subsection provides that the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

13

2064, 80 L.Ed. 2d 674 (1984).  The burden is on the petitioner to show that counsel's

representation fell below an objective standard of reasonableness.  Id. at 688.  The court's

scrutiny shall be "highly deferential" and the court must apply a "strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689-

90.  See also Marler v. Blackburn, 777 F.2d 1007, 1010 (5th Cir. 1985).  A habeas court must be

careful not to second guess legitimate strategic choices made by defense counsel which under the

light of hindsight seem ill-advised and unreasonable.  Sawyer v. Butler, 848 F. 2d 582, 587-88

(5th Cir. 1988).

      The Strickland court outlined the extent of prejudice that must be established by the

defendant:

> An error by counsel, even if professionally unreasonable, does not warrant setting
> aside the judgment of the criminal proceeding if the error had no effect on the
> judgment.  Cf. United States .v Morrison, 449 U.S. 361, 364-65 (1981).

> Defendant must show that there is a reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would have been different.  A
> reasonable probability exists if the probability is sufficient to undermine
> confidence in the outcome.

> When a defendant challenges a conviction , the question is whether there is
> reasonable probability that absent the errors the fact-finder would have a
> reasonable doubt respecting guilt.

Strickland, supra, at pages 691, 694-95; see also Taylor v. Maggio, 727 F.2d 341 (5th Cir. 1984);

U.S. v. Diaz, 733 F. 2d 371 (5th Cir. 1984).

      Strickland's prejudice element requires a showing "that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a probability sufficient to undermine confidence in the

14

outcome." Sayre v. Anderson, 238 F.3d 631, 635 (5th Cir. 2001), *citing* Strickland, 104 S.Ct. at 2068.  However, self serving conclusory statements that the outcome would have been different "fall far short of satisfying Strickland's prejudice element.  Id.

Because both Strickland factors, that of deficient performance and prejudice, must be satisfied, an ineffective assistance contention may be rejected on an insufficient showing of deficient performance or prejudice.  Strickland, supra.

When the effectiveness of counsel is at issue, although the ultimate question of whether counsel's performance was deficient and prejudicial is a mixed question of law and fact, state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of §§ 2254(e)(1). *See* Strickland, 466 U.S. at 698, 104 S.Ct. 2052; Nobles v. Johnson, 127 F.3d 409, 418 (5th Cir.1997), *cert. denied,* 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998); Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir.), *cert. denied,* 513 U.S. 960, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994); Carter v. Collins, 918 F.2d 1198, 1202 (5th Cir.1990).  The Fifth Circuit has held that "under AEDPA a state court decision rejecting a Strickland claim must be accepted unless it was an unreasonable application of its teaching." Granados v. Quarterman, 455 F.3d 529, 534 (5th Cir. 2006).

In the case at bar, the trial court addressed petitioner's ineffective assistance of counsel claims as follows:

> Mr. Dugas has not established the first prong enunciated in Strickland – deficient performance.  The defense team in Mr. Dugas' case was constantly hampered by Mr. Dugas' unwillingness to cooperate.  First, Mr. Dugas refused to cooperate with his first two court-appointed attorneys, Mr. LeGros and Mr. Colwart.  Then, once two additional attorneys were appointed, Mrs. Burton and Mr. Jones, Mr. Dugas refused to cooperate with them.  Mr. Dugas was afforded the assistance of a number of attorneys in this case.  His failure to cooperate with those attorneys

15

will not be a basis for appeal.  Secondly, Mr. Dugas has failed to prove that, even if his attorneys were deficient, he was prejudiced in any way by that deficiency.

A defense was difficult to construct because of the six inculpatory statements made by the defendant before and after the murder, which included a full confession to the police.  Mr. Dugas has failed to show that but for his attorney's alleged failures, the end result would likely have been different.  Mr. Dugas has failed to overcome the presumption that his attorneys did render adequate assistance and did exercise reasonable professional judgment.  The attorneys appointed to represent Mr. Dugas had clearly investigated the case.  A review of the trial transcript reveals that Mr. Dugas' attorneys aptly questioned witnesses on cross-examination, presented witnesses in support of Mr. Dugas' defense and otherwise performed adequately in terms of their representation of Mr. Dugas.[14]

The Third Circuit upheld the denial of petitioner's ineffective assistance of counsel claims, noting that the trial court applied the appropriate standard under <u>Strickland</u>.

### **Failure to investigate,  prepare a defense, and secure witnesses**[15]

Dugas maintains that he was denied the effective assistance of counsel because counsel failed to:  interview witnesses, find possible impeachment evidence regarding Faylisa Demouchet and Paula Marie Faulk, call available witnesses, prepare a defense that someone else committed the crime, and otherwise properly investigate the case.

The Fifth Circuit has held that " '[h]ypothetical or theoretical' testimony will not justify the issuance of a writ...." <u>Martin v. McCotter</u>, 796 F.2d 813, 819 (5th Cir.1986).  "[T]he presentation of testimonial evidence is a matter of trial strategy and ... allegations of what a witness would have testified are largely speculative" and complaints regarding uncalled witnesses are not favored.   <u>Coble v. Dretke</u>, 444 F.3d 345, 350 (5th Cir. 2006).

---

[14] Exhibit to Rec. Doc. 13 at pps.776-777.

[15] This covers (a) and (c) of petitioner's ineffective assistance claim.

16

Petitioner has presented nothing to suggest that his counsel's decision not to call specific witnesses in support of his defense was not a legitimate choice in trial strategy.  With respect to counsel's alleged failure to investigate possible impeachment evidence regarding two of the state's witnesses, petitioner fails to show that any such evidence even existed.  Thus, petitioner's conclusory allegation does not give rise to a claim for federal *habea*s relief.

Likewise, petitioner's argument that counsel was ineffective for failing to prepare a defense premised on the argument that someone else murdered the victim is without merit.  The trial transcript shows that counsel questioned the victim's sister, Sandra Celestine, who lived with the victim, regarding victim's relationship with her boyfriend Jerry Williams.[16]  Ms. Celestine testified that the day before the murder, she heard the victim and Mr. Williams arguing.[17]  Counsel also questioned Mr. Williams about the argument and his resentment over the fact that she had gone out to a club and was having a good time without him.[18]  Likewise, defense counsel questioned Wilton Sylvester, the victim's brother, and raised issues with his testimony, specifically that when he returned home to his sister's trailer on the night of the murder and got into bed with her, he did not notice that she had been struck in the head and that there was blood in her bed.[19]

In closing argument, counsel pleaded with the jury to closely examine the witnesses' testimony, because there were inconsistencies.  Counsel urged that the inconsistencies and the

---

[16] Exhibit to Rec. Doc. 13 at p. 1821.

[17] Id. at p. 1823.

[18] Id. at p. 1849.

[19] Id. at p. 1869.

17

holes in the state's case should result in a verdict of not guilty.  Thus, counsel attempted to establish that there were other suspects who could have committed the murder.

Trial counsel's decisions regarding witnesses and presenting evidence are clearly strategic trial moves.  Petitioner fails to offer any evidence or argument that had counsel performed differently, the result of the case would have been different.  Accordingly, the undersigned concludes that petitioner was not denied the effective assistance of counsel.  *See* <u>Strickland</u>, *supra*; <u>Sawyer v. Butler</u>, 848 F. 2d at 587.

### Failure to investigate and prepare a defense to the false confessions

Petitioner maintains that counsel should have investigated the circumstances surrounding his confessions.  A review of the record shows that counsel filed a motion to suppress the confessions and aggressively cross-examined witnesses concerning the confessions.  As set forth below in Claims 2 and 3, petitioner's confessions were voluntarily given and properly admitted into evidence.  Petitioner fails to show what additional evidence could have been adduced that would have prevented the confessions from being admitted at trial.

Considering counsel's actions in filing the motion to suppress, and the lack of evidence indicating that the confessions were involuntary or otherwise inadmissible, the undersigned concludes that petitioner's claim is without merit.

### Failure to protect petitioner's "right to testify"

Petitioner argues that his two attorneys gave contradictory concerning whether or not he should testify at trial.  Petitioner maintains that this shows that counsel did not have a trial strategy and because of this, he felt he had no option but to testify in order to put his defense

18

before the jury.  Petitioner now concludes that his "testimony prejudiced him more than it helped where it allowed the prosecutor to introduce the defendants' prior criminal record."[20]

A criminal defendant has the constitutional right to testify on his own behalf.  Rock v. Arkansas, 483 U.S. 44, 49-52, 107 S.Ct. 2704, 2708-10, 97 L.Ed.2d 37 (1987).  This right is granted to the defendant personally.  Id. at 51, 107 S.Ct. at 2709.  "A defendant may of course waive his right to testify, and frequently does so on the advice of counsel."  Jordan v. Hargett,  34 F.3d 310, 312 (5ᵗʰ Cir. 1994).

Here, the record shows that prior to petitioner's testimony, the issue regarding his right to testify and the ramifications thereof were addressed:

> BY MR. JONES:  I said we've reached an impasse in which we need to put something on the record as the attorneys for Mr. Dugas and I would like the Court to question Mr. Dugas and explain to him what we are saying, it is –
>
> BY THE COURT:  [What] is your impasse?
>
> BY MR. JONES:  Judge, he wishes to testify and we're advising him not to.
>
> BY MR. COMEAUX:  Judge, before we bring Mr. Dugas in and Mr. Jones knows about this.  I have Certified Copies of convictions of Mr. Dugas for Attempted Murder and Second Degree Murder in Texas which he did four years at hard labor and also, an Arson charge, Third Degree Arson in which he served 187 days in Texas, both of them convictions, Your Honor.  I know that is one of the things that Mr. Jones is struggling with and for the Court's information when you talk to Mr. Dugas it might by beneficial.
>
> BY THE COURT: Thank You.  Okay is that it?
>
> BY MR. JONES: Yes, Judge.

---

[20] Rec. Doc. 1 at p. 21.

19

BY THE COURT: Will you bring in Mr. Dugas.  Mr. Dugas, would you come to the podium, sir.  Mr. Dugas, let me explain.  Mr. Jones and Ms. Burton have advised the Court that you want to testify.

BY THE DEFENDANT: Yes, sir.

BY THE COURT: That's against their advice, is that right, you understand that?

BY THE DEFENDANT: Yes, sir.

BY THE COURT: You understand if you get on the witness stand that the prosecution will impeach you, try to impeach you.  You know what that's saying, they're going to try to say you're lying and they're going to bring up every conviction you've had all of your past trouble in Texas and anything else that they can bring up.

BY THE DEFENDANT: Yes, sir.  He told me that since yesterday, day before yesterday, or –

BY THE COURT: Okay.  You understand that your attorneys and the staff are really trying to help you, and that their advice is that you don't testify?

BY THE DEFENDANT: Yes, sir, but I mean it's something that I know I didn't do.  I'm going to stand up and say how it was done to me.

BY THE COURT: Regardless of – and I , of course am advising you that it may not be in your best interest to testify, regardless of all that you still want to testify; is that right?

BY THE DEFENDANT: Yes, sir.

BY THE COURT: In your own defense?

BY THE DEFENDANT: Yes, sir.[21]

Thus, it is clear that defense counsel advised petitioner not to testify.  Counsel also insured that the trial judge explained to petitioner that if he did testify, the prosecution would bring in evidence of his previous criminal convictions.  Despite these consequences, petitioner decided to testify.  Considering the foregoing, it is clear that counsel worked to protect

---

[21] Exhibit to Rec. Doc. 13 at pps. 2009-2011.

20

petitioner's right to remain silent, however, counsel could not force petitioner not to testify.

Thus, petitioner's claim is without merit

### **Failure to develop a meaningful relationship with petitioner**

Petitioner argues that "Counsel did not establish a relationship of trust with Mr. Dugas, and was therefore in no position either to learn information critical to the defense, or persuade Dugas of the wisest course of action in his own defense."[22]  Petitioner maintains that he distrusted counsel because counsel "continued to disregard his innocence and repeatedly attempted to get him to take the 'deal' offered by the state."[23]

In a pre-trial hearing, which was in chambers and the prosecutor was not present, counsel for petitioner stated:

> Judge, let me just say for the record.  The defendant and I have had a very complicated love/hate relationship in our attorney/client relationship that we've had.  But a lot of the problems come down to me trying to discuss with him the discovery that has been given to us, the evidence that the State is going to be presenting, and him just unwilling to accept that or come up with, helping me to come up with ideas or solutions to get around some of the evidence that is going to be presented at trial.  And it's this question of he wants to shoot the messenger because of the message.  Okay.

> I've investigated the case.  We've gone, my office and I, we've talked to potential witnesses.  We've tried to talk to potential witnesses.  We've been shut out by his family, told not to go over there anymore.  There were problems with, you know, getting cooperation with the family.  That has been taken care of though.  But all the witnesses that he says were going to say one thing, we check out, and they don't say what he says they're going to say.  When I come back to tell him about it, that's when he goes off.

> Like yesterday, you know, he's sitting here saying that it's all my fault.  Yesterday he walked out on me.  He walked out on me.  I went there yesterday to talk in

---

[22] Rec. Doc. 1 at p. 21.

[23] Rec. Doc. 1 at p. 22.

more detail about what the jury selection process was going to be, to discuss some things that we've been talking about over the last few months about trial strategy, and the decision had to be made yesterday because it was going to affect voir dire, and he walked out on me.  He said, I don't have anything to say to you anymore, and he walked out one me.

And that's not the first time.  There has been several times when I literally had to stand between him and the door of the attorney booth to keep him from walking out, so that we could have a full attorney/client relationship and discuss these things.[24]

In addition to this attorney, petitioner was appointed two other attorneys, who investigated and ultimately tried the case.  Although counsel may have encouraged petitioner to accept a plea offer from the State, there is no evidence that this was not sound advice, considering that petitioner was ultimately convicted and sentenced to life imprisonment. Moreover, although petitioner may not have trusted counsel, that does not show that counsel performed deficiently. Additionally, petitioner fails to establish how the lack of meaningful relationship affected the outcome of the case.  Regardless of their relationship with petitioner, counsel investigated the case, filed motions, and advocated for their client at trial.  Considering the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that a *habeas* court must be careful not to second guess legitimate strategic choices made by defense counsel, the undersigned concludes that petitioner's trial counsel's performance was not deficient.  *See* Strickland, *supra*; Sawyer v. Butler, 848 F. 2d at 587.  Thus, petitioner's claim is without merit.

---

[24] Exhibit to Rec. Doc. 13 at pps. 1352-1353.

22

**Failure to object to petitioner's removal from the courtroom**

Petitioner argues that counsel was ineffective because they failed to object to petitioner's removal from the courtroom and did not request a television monitor be set up outside the courtroom so that petitioner could observe the proceedings.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI..  A defendant can consent to not being present and "can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057,1060 - 1061 (U.S. 1970).

Petitioner's trial initially commenced in March, 2000.  A jury was seated, but petitioner repeatedly stated that he had fired his court-appointed counsel. After petitioner refused to speak to his attorney during voir dire, the trial judge appointed two other attorneys to represent him, and continued the trial.

On  January 30, 2001, during the voir dire in the second setting of petitioner's trial, petitioner interrupted the questioning of the potential jurors and had the following colloquy with the court:

> BY THE DEFENDANT:  Excuse me, Your Honor, I got one specific reason I need to talk to you about.

> BY THE COURT:  Sir, sir, now is not the time.  I'll give you the time.

> BY THE DEFENDANT:  I got a paper right here where the Court granted me a speedy trial.

23

BY THE COURT:  Yes, sir.

BY THE DEFENDANT:  I got a hundred and twenty days, Your Honor.  I got DNA test showing that it's not me.

BY THE COURT:  I'm going to tell you for the third time you be quiet or you're going to be removed from this courtroom.

BY THE DEFENDANT:  I got a paper right here saying –

BY THE COURT:  You will be quiet, sir.

BY THE DEFENDANT:  Showing these lawyers not defending me to the fullest.

BY THE COURT:  All right.

BY THE DEFENDANT:  I don't want them.

BY THE COURT:  For the fourth time I'm going to ask you to be quiet.  Are you going to be quiet, sir?

BY THE DEFENDANT:  They fired.  I don't want these lawyers.

BY THE COURT:  Are you going to be quiet, sir?  Do not interrupt me again.  This trial is going to proceed.  Do you understand, sir?

BY THE DEFENDANT:  I don't want these lawyers, Your Honor.  I got papers saying right here saying –

BY THE COURT:  All right.  Take him away.  I find that Mr. Dugas has become disruptive, wants to disrupt these proceedings and therefore will be escorted.  He will be taken to a nearby room and kept informed and I expect counsel that he kept informed of every event that occurs in here.[25]

The trial judge then held a bench conference with the attorneys, who advised that

petitioner had refused to speak to them during the voir dire.  The court noted that petitioner had

followed a pattern of disrupting court proceedings for the three years his case had been pending,

---

[25] Id. at pps. 1533-1535.

24

by "sabotaging his attorneys, by sabotaging the process, by doing the things that he's doing in

here."[26]  Later, while voir dire continued, the court held a bench conference and noted:

> BY THE COURT:  [L]et me just put on the record now that about a half hour ago,
> Mr. Dugas, we have a small room about 15 feet off the courtroom that Mr. Dugas
> was housed in along with a deputy sheriff, and he became [b]oisterous and loud
> and cutting up and demanding to go back to his cell.  He demanded not to be here.
> I believe that was also – Miss Lucretia Burton, co-counsel also knows about that
> but I just had to comment that and I think you might even talk to the deputies
> about it.   I felt that I should not bring him in and let him start cutting up and
> absolutely making a chaotic situation as he tried to do this morning to sabotage
> the trial going through.
>
> ***
>
> BY MR. JONES:  And I'd also like to add to that, Judge.  Specifically, Mr. Dugas
> was making a lot of noises during my questioning of the first panel of prospective
> jurors when the door was open for a brief moment in which the bailiff was
> instructed to close the door.  It's my understanding that Miss Burton and Miss
> Helen Wiltz, who is also a staff member with out office, were conferring with him
> at that particular point, and they did come back and we had a conversation on the
> matter and he did request to be brought back across the street to his cell.  That is
> correct.[27]

After the jury was picked and dismissed for the day, the trial judge again addressed

petitioner's behavior.  The trial judge questioned the bailiff assigned to guard petitioner, who

testified that:

> I went to the back room where the subject was being held and he was creating a
> ruckus saying he didn't want to stay here, he didn't want to be in this court
> building, he fired his attorney and he wanted to go back to jail.  No matter what
> we did to him, he did not want to be here and did not want to talk to his attorney.[28]

---

[26] Id. at p. 1537.

[27] Id. at pps. 1678-1679.

[28] Id. at p. 1728.

25

The trial judge noted that despite petitioner's behavior and refusal to assist his attorneys, counsel had aptly proceeded through voir dire.  The judge also stated:

> I think that's true and let me further explain that we do not have a video, a remote video facility here.  We did put Mr. Dugas twenty feet away from the courtroom so that Mr. Jones and his staff and Miss Burton, co-counsel could consult with him and that was going on all morning when he was taken out of the courtroom.  But I can tell you right now the defendant's disruptive conduct during this trial has forfeited his right to be present at the trial.   He's been repeatedly warned by the Judge.  Repeatedly warned, not only in this case, but in prior hearings as the record will bear me out, that he cannot use his own disruptive, disorderly and disrespectful behavior to get his way which is essentially walk out of jail with a pass, a free pass. That's not going to happen.
>
> So, I'm satisfied that virtually everybody in this system has tried to give him his constitutional rights, and I think the reason we're all so sad about is that despite this extraordinary effort he refuses to cooperate.[29]

Petitioner argued on post-conviction that the trial court erred in excluding him from the trial.  The trial court denied the claim noting that "Mr. Dugas was excluded because of his own intentional acts."[30]  Now, petitioner maintains that trial counsel was deficient for failing to object to his removal from the courtroom.  Clearly, the trial judge attempted to allow petitioner to participate in his trial, however, petitioner insisted on disrupting the trial and refused to speak with counsel.  Petitioner fails to show that counsel's performance was deficient because he failed to object to petitioner's removal from the courtroom.  Obviously, such an objection would have been futile since the trial judge repeatedly commented that petitioner's removal was his own fault.  Likewise, petitioner's argument that counsel should have asked for a recess in order to explain the situation to him and to let him know that the court would address any issues he had at

---

[29] Id. at pps. 1732-1733.

[30] Id. at p. 779.

a later time, is unpersuasive.  At the time, petitioner refused to speak to counsel, thus, any

conference between counsel and petitioner would have been futile.

Moreover, petitioner fails to show how the outcome of the trial would have been different

had he been present or had a video feed of the proceedings.  Petitioner repeatedly interrupted voir

dire, in front of potential jurors, and made a spectacle of the trial.  Had he been allowed to

continue, there is no assurance that the jury would have been adverse to him based on his

courtroom behavior.

Considering the foregoing, the undersigned concludes that petitioner's claim is without

merit.

### Allowed hearsay testimony to be admitted into evidence

Petitioner argues that counsel was ineffective because counsel did not object to hearsay

statements made by Shirley Marie Williams, Faylisa Demouchet, and Paula Marie Faulk.

Petitioner acknowledges that counsel objected to Ms. Williams's testimony on hearsay grounds,

however, he argues that counsel should have requested a "curative statement" to the jury.

Ms. Williams was the State's first witness and she testified regarding a conversation she

had with petitioner:

Q.     What did Harold tell you?

BY MR. JONES: That's hearsay.[31]

Thereafter, the jury was removed from the courtroom and counsel argued that the

statement the witness was going to make was hearsay.  After considering the argument of both

---

[31] Id. at pps. 1759-1760.

parties, the judge ruled that Ms. Williams's testimony was admissible because she was testifying as to petitioner's declarations against interest, which are admissible under La. Code of Evid. art. 804.B3.  Thus, petitioner's claim is without merit because counsel did object to Ms. Williams's testimony.  Moreover, there was no basis for counsel to request a curative instruction to the jury because the judge ruled that the testimony was admissible.

Likewise, petitioner's claims regarding the testimony of Ms. Demouchet and Ms. Faulk are without merit.  Ms. Demouchet and Ms. Faulk testified regarding statements they heard petitioner make to the victim on the night of the murder.[32]  Although counsel did not object, petitioner fails to show that this was deficient performance because any objection would have been overruled for the same reason the court allowed Ms. Williams to testify regarding what petitioner had stated – petitioner's statements were admissible under La. Code Evid. art. 804B3.

Considering the foregoing, the undersigned concludes that counsel's performance was not deficient.  Additionally, there is no reasonable probability that, but for the failure of petitioner's trial counsel to specifically object to any identified hearsay, the outcome of the trial would have been different.  Thus, petitioner's claim is without merit.

### Failure to secure independent experts to challenge the DNA evidence

Petitioner argues that counsel should have requested funding to retain DNA experts to testify on behalf of the defense.

The State is not required to furnish a criminal defendant with a non-psychiatric expert upon demand.   Rather, such experts should be provided only if the evidence is both critical and

---

[32] Id. at p. 1771, 1778.

28

subject to varying expert opinion.  However, the defendant must demonstrate more than a mere

possibility of assistance from a requested expert.  Yohey v. Collins, 985 F.2d 222, 227 (5th Cir.

1993).  Although petitioner argues that there should have been DNA evidence regarding the

sperm samples found in the victim's home, such evidence was immaterial in the sense that the

two men who petitioner argues may have committed the crime, also lived with the victim and

therefore there was an explanation for their DNA to be in the home.  Petitioner's conclusory

allegations that expert testimony would have been beneficial for various reasons are not

sufficient.  See Ross v. Estelle, 694 F.2d 1008, 1012 (5th  Cir.1983) (emphasizing that mere

conclusory allegations do not raise constitutional issues in habeas proceedings); see also,

Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir.1985) ("for the appellant to demonstrate the

requisite Strickland prejudice, the appellant must show not only that this testimony would have

been favorable, but also that the witness would have testified at trial."); see also Crane v.

Johnson, 178 F.3d 309, 315 (5th Cir. 1999) ("[E]ven assuming that trial counsel erred in failing to

seek the appointment of a confidential mental health expert, Crane has not shown how he

suffered prejudice from this failure.  Crane produced no persuasive psychiatric evidence in the

district court that if produced at trial, would have undermined confidence in the resulting

verdict.); see also Martin v. McCotter, 796 F.2d 813, 819 (5th  Cir.1986) ("hypothetical or

theoretical testimony will not justify the issuance of a writ").

Additionally, counsel's decision not to have additional DNA testing performed was a trial

strategy.  Since the other possible suspects had explanations for their DNA being present at the

crime scene (they lived there) and petitioner did not have an explanation, any further testing may

have gone against petitioner's interests.   Accordingly, the undersigned concludes that

petitioner's claim is without merit.

### **Failure to investigate petitioner's mental history and seek *Ake* funding**[33]

Petitioner argues that counsel should have retained an expert to a mental health expert to

testify that petitioner did not have the mental capacity to waive his rights regarding his

confession.  Petitioner also maintains that counsel should have obtained funding to hire an

independent investigator to find evidence showing that the witnesses in the case were not

testifying truthfully.

In Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United

States Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity

at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure

the defendant access to a competent psychiatrist who will conduct an appropriate examination ..."

Counsel filed a motion to appoint a sanity commission to examine petitioner's mental

capacity.  Drs. James Blackburn and James Falterman examined petitioner and reported to the

court that he had the mental capacity to stand trial.[34]  Although the issue in the sanity commission

was whether petitioner was capable of standing trial, petitioner provides no evidence that a

different examiner would have concluded that there was an issue with petitioner's mental

capacity at the time of the crime or the time of his confession.  It is reasonable to assume that

even had counsel retained an expert to address petitioner's mental abilities, the State would have

---

[33] This covers (i) and (j) of petitioner's ineffective assistance claim.

[34] Exhibit to Rec. Doc. 13 at p. 812.

30

called either Dr. Blackburn or Falterman to discuss the fact that they found that petitioner did not have sufficient deficiencies in his mental capability.

Thus, counsel explored petitioner's mental issues.  Counsel's decision not to retain, or seek funding for, a mental health was not unreasonable in light of the lack of evidence indicating that petitioner had severe mental problems.  Petitioner's conclusory allegations of an inability to understand and knowingly waive his rights is insufficient to show that counsel should have retained a psychological expert.

Likewise, petitioner's assertion that counsel should have retained a private investigator to investigate the credibility of the witnesses and to establish that the testimony was false is meritless.  Petitioner fails to show any evidence or plausible argument that any such evidence existed.  Moreover, it is clear from the transcript that counsel fully investigated this case.  Thus, there was no need for an additional investigator to perform the same tasks that counsel had already undertaken.  Accordingly, petitioner's claims are without merit.

### *Claims 2 and 3: The confessions*

Claims 2 and 3 deal with petitioner's confessions.  Petitioner argues that the confessions were not voluntary and that they were erroneously admitted into evidence because they were given after he had invoked his right to counsel.

On March 2, 2000, the trial court held an evidentiary hearing on petitioner's motion to suppress the confessions.[35]   During the course of the hearing, detectives Dicky Dan Davitt, Jr. Diana Batiste, and Joseph Arthur Boyd, testified regarding the circumstances surrounding their interrogation of petitioner.

_____

[35] Exhibit to Rec. Doc. 13 at pps. 1255-1342.

31

Detective Davitt testified that he went to the crime scene and was told that petitioner was a possible suspect because petitioner's wife had recently left him with the assistance of the victim (who was her sister).[36]  Detective Davitt went to petitioner's home to ask him to go to the Breaux Bridge police station for questioning.  When petitioner answered the door, petitioner said he needed to get dressed before he could leave.  Detective Davitt asked him to bring the clothes on he had the night before.   Petitioner responded that those clothes were in the washing machine.[37]  At that time, Detective Davitt asked petitioner to stop the washing machine, and he called for Detective Batiste to meet him at the home to assist him.  Detective Davitt then read petitioner his Miranda rights, which was standard procedure when questioning a suspect.  Once Detective Batiste arrived, petitioner gave Detective Davitt permission to remove the clothes from the washing machine.  Detective Davitt testified that he did not use any "force, threats, menace, or any coercion" in order to get that permission.[38]  Petitioner was then transported to the police station.

Officer Boyd testified that there were several possible suspects and he spent the day of the crime interviewing witnesses regarding those suspects.[39]  He interviewed petitioner at the police department at 11:00 a.m.  Officer Boyd advised him of his Miranda rights and petitioner signed a waiver of his rights.  Petitioner told Officer Boyd that he had been with the victim at Cora's

---

[36] Id. at p. 1255.

[37] Id. at p. 1256.

[38] Id. at p. 1259.

[39] Id. at p. 1298.

lounge and her home, however he denied any involvement in the murder.[40]  Officer Boyd noticed

a lump on petitioner's lip and he asked him if he would go to the hospital to have it looked at and

also whether he would give samples of saliva and blood.  Petitioner agreed.[41]  Officer Boyd took

petitioner to the hospital, and after he was examined, Officer Boyd transported him to the St.

Martin Sheriff's Office.  Officer Boyd testified that petitioner was not under arrest at this time

and he was free to leave.[42]  Before questioning petitioner, Officer Boyd read the Miranda rights to

him again.  Petitioner appeared to understand his rights and he again waived them.[43]  At

approximately 5:30 p.m., petitioner agreed to take a polygraph test, however, he changed his

mind and invoked his right to counsel:

> A.  I informed the polygraphist of this which ceased any attempt to do a polygraph.  After informing the polygraphist, I went back in the interview room and asked Harry if he still wanted to answer questions I had in regards to this investigation.  At that point, Harry indicated to me he did not want to answer any more questions, that he wanted to speak with a lawyer.
>
> Q.  All right.  At that point in time, what did you do with Mr. Dugas?
>
> A.  I ended all interview or interrogations with Mr. Dugas, and we left the Sheriff's office.  I was transporting him back to the Breaux Bridge Police Department at the request of Captain Butch Dupuis.
>
> Q.  All right.  Did you bring him to the Breaux Bridge Police Department?
>
> A.  Yes, sir.
>
> Q.  Is that the same place you had initially picked him up at?

---

[40] Id. at pps. 1300-1301.

[41] Id.

[42] Id. at p. 1302.

[43] Id. at p. 1303.

33

A.  Yes, sir.

Q.  All right.  And you released him at the Breaux Bridge Police Department?

A.  Yes, sir.

Q.  And you told him basically he was free to go?

A.  He was left on the parking lot.[44]

Detective Batiste testified that she had known petitioner since childhood.[45]  When she was leaving the police station around 7:00 p.m. on the evening after the murder, petitioner stopped her:

A.  *** While I was exiting out the back door going to the parking lot to go to my car, Mr. Harold was sitting on the parking lot down with his hands like this.  (Witness indicating)

BY THE COURT:  Let the record show with his chin between his hands.

***

A.  So as I was passing, I said, "What's up, Harold?"

Q.  Okay.

A.  Just saying a hello like a slang of saying, What's up; hi.  And at that point, Harold says, "Di, can I talk to you?"  And then, I turned and I said, "Well, I'm not sure.  Let me go to the car."  And I had to go – and a that point, I directed myself to, it was Captain Butch Dupuis and Detective Arthur Boyd.  And I went to the car because we were getting off and I didn't want to go and do anything that without going through them.  So I went up the car, and I asked him.  I said –

Q.  All right.  Let's stop a second.  At the time that you came around the corner and asked Harry, "What's up?", and he said "Can I talk to you, Di?", was Mr. Dugas handcuffed?

---

[44] Id. at p. 1305-1306.

[45] Id. at p. 1266.

34

A.  Oh, no, Uh-uh.

Q.  Was he in any type of way restrained?

A.  No, sir.

Q.  Do you know whether or not Mr. Dugas had been released from questioning?

A.  I figured he was because I mean he was by hisself sitting down.

Q.  At the – on the parking lot?

A.  Uh-huh.

Q.  Okay.

A.  On the sidewalk.

Q.  At any point in time, was it your intention to initiate any conversation with Mr. Dugas?

A.  No.  Really, I wanted to go home.

Q.  Okay.  And he – you just said, "What's up?" in a slang type hello?

A.  Yeah.

Q.  Okay.  And he said, "Can I talk to you Di?"

A.  Right.

Q.  Okay.  So at that point, you proceeded to Captain Dupuis and Arthur Boyd?

A.  Yeah.  I still didn't talk to Mr. Harold.  I went direct to the car because they were parked there.

Q.  Okay.

A.  And I asked them, I said, "Harold asked if I can talk to him, and I don't want to go and talk to him if ya'll have something.  I didn't know what was up because we were planning on going home.  That's all I was doing.

Q.  All right.

35

A.  And so, that's when they told me, "Well, you could talk to him."  And I returned back to where Harold was on the sidewalk.  And I said, "Well, Harold, they say I can talk to you.  Do you want to come in?  We'll talk on the inside instead of outside at the office."

Q.  All right.  Did ya'll go into the office?

A.  Yes, sir.  We did.

Q.  All right.  Now, prior to talking to him, did you read him his rights?

A.  Yes, sir.

***

Q.  All right.  And did Mr. Dugas seem to understand his rights?

A.  Yes, sir.  He did.

Q.  Did you ask him to sign stating he understood his rights?

A.  Yes, sir.  I did.

Q.  And did he, in fact, sign the document?

A.  Yes, sir.  He did.

Q.  All right.  And after you read Mr. Dugas' rights, did he appear to understand his rights?

A.  Yes, sir.  He did.

Q.  All right.  And did you ask him to sign a waiver of his rights?

A.  Yes, sir.  I did.

Q.  And did he agree to talk to you and sign a waiver of the rights?

A.  Yes, sir.  He did.

***

36

Q.  Did he – did he first volunteer information, and then you asked him questions or did you immediately ask him questions?

A.  We went in there.  We started talking.  I asked him – he kept telling me, "Di, I didn't do that."  "I swear I didn't do it."  He kept saying that.  And I would say like for example, "You didn't what?"  "What you didn't do?"  "Tell me what you didn't do."  And at one point, I remember recalling him saying about the blood, and I came back again, "What about the blood?"  "What blood?" You know, I kept on with those kind of questions.

Q.  Was he continuously denying any involvement in the homicide of Helen Alexander?

A.  At the beginning, yes, sir.

Q.  Okay.  At some point in time, did he then change his story?

A.  Yes, sir.  He did.

Q.  Okay.  What did he tell you, Detective Batiste?

A.  He told me that he had went over there to Bun's house, which is Helen the victim, and it started over he wanted a cigarette or some or Patty wanted a cigarette because Patty was there at the time visiting his sister.  And uh, he asked – he said he really went in all honesty to ask Bun if Bun would do him a favor talk to Nina, which is his wife, to see if Nina would allow him to at least see his children because he said he had been missing his children.  And he said that uh she started going off telling him some ugly things like "you're never going to see them 'blank' children" and "that's not your children."  Just telling him a host of ugly things.  And uh, that's when he said that he was leaving out of the trailer door from the back, and he said that she threw some kind of object at him.  He wasn't clear to whatever the object was at the time.  So, then he said that uh when she threw the object whatever it was –

Q.  Did he say it hit him?

A.  He just said he think it hit him on his leg.  Okay.  So he said he picked it up.  And he said, Di, I really, I went in there just to talk to her, to try to calm her down, and that like she got out of hand, you know, attacking after him.  And during that, he said that he struck her.

Q.  With what?

37

A.  With the object.  He said – he never really identified the object.  He said the object that he picked up because he didn't go over there with an object planning to do nothing.  He just said, "I picked it up, and I struck her."  And he struck her twice.

Q  Now, after he gave you this initial statement that he had done it –

A.  Uh-huh.

Q.  – that he struck her –

A.  I got up, and I went tot he door to let the Captain be aware of what was going on.

Q.  All right.  Who was present in the room when that happened?

A.  It was Detective Yogi, which is Evan William, Detective Dicky Davitt.

Q.  Okay.  Now, Evans Williams, was trying to get the camera to work; is that correct?

A.  Yes.  He was holding the camera.

Q.  And he was having some problems with the camera?

A.  Yes, sir.  He was.

Q.  All right.  At that point in time, [you] went to the door.  What did you do?

A.  I opened the door, and the Captain was sitting, they were sitting out on the outer office, and I told him, I said, "Harold is saying what he did to Bun."  And so, the Captain said, "Well, since he's giving it up to you, you're going to have to proceed."

Q.  Okay.  So you went ahead and –

A.  And I continued.

Q.  – took the confession?

A.  Yes, sir.  I did.[46]

---

[46] Id. at pps. 1269-1274.

38

Two days after his arrest, petitioner confessed a second time, this time to Officer Boyd. Officer Boyd testified that he was at the jail on an unrelated case, when petitioner had an officer tell Officer Boyd that he wanted to speak with him.[47]  Officer Boyd testified that he reminded petitioner of his right to an attorney.   Officer Boyd did not ask any questions:

> A.  Harry indicated that he basically wanted to apologize to me for having to speak with him for such a length of time.  Harry indicated that through our interview there was a point where he wanted to confess but there was certain information that I brought out to him that was incorrect; and when I showed him pictures of the victim, he really didn't believe that's what he had actually done. Harry indicated that when the victim approached him from his recollection all he remembered was hitting her with the object and that was it.[48]

At trial, petitioner testified that he knew he was not under arrest before he gave his confession to Detective Batiste, however he did not feel free to leave.[49]  He testified that the officers "threatened to handcuff me and beat me up."[50]  He also testified that the officers told him that his in-laws thought he had committed the crime and that they were harassing his mother:

> A.  Well, after they started threatening me, you know, and using my mother as a threat you know, they had already made my in-laws believe that – they said that I was on crack cocaine.  They said that, you know, they made them believe that I had raped the girl, they made them believe that was my skin.  I had a fever blister on my nose, they said, that she had scratched me right there, you know.
>
> Now, they done made everybody, my mother, my sisters, my in-laws, I mean everybody think that was me, you know.  Now, my mother and my sister live in the same house you know, I told them I said I don't do crack.  You know, I told them I have smoke marijuana before, I said, but I didn't even smoke no marijuana,

---

[47] Id. at p. 1307.

[48] Id. at p. 1308.

[49] Id. at p. 2016, 2019.

[50] Id. at p. 2019.

you know.  They said we're not talking about marijuana we're talking about crack cocaine and they that's why you did it.[51]

Petitioner testified the Detective Batiste had encouraged him to say that he acted in self defense and to confess because his in-laws were harassing his mother and the DNA tests would show his innocence.[52]

### State court rulings on the confessions

The trial court denied petitioner's motion to suppress this evidence.[53]  The Third Circuit Court of Appeal analyzed petitioner's claim that the officers violated his right to remain silent, and made the following factual and legal conclusions:

> Based on the testimony of the officers, it was reasonable for the trial court to conclude that Defendant initiated the contact with the officers, which resulted in his first statement at issue.  There is nothing in the record to suggest the police acted in any way that was reasonably likely to elicit a statement from Defendant.
>
> Furthermore, after the Defendant was arrested, he again confessed the crime to Detective Boyd.
>
> ***
>
> Again, the record supports the admission of this statement.  Detective Boyd responded to the Defendant's request and did nothing that was likely to elicit an incriminating statement from the Defendant.
>
> ***
>
> Finally, at trial, both Detectives Batiste and Davitt testified that in no way did they threaten or induce the statements from the Defendant.  They both testified that they believed the Defendant understood his rights and chose voluntarily and freely to confess to the crime.  Accordingly, the trial court did not err when it denied the

--------------------------------------------------

[51] Id. at p. 2020.

[52] Id. at p. 2022-2023.

[53] Exhibit to Rec. Doc. 13 at pps. 579-581.

40

Defendant's motion to suppress his confessions.  This assignment is without merit.[54]

### *Claim 2: Voluntariness of the confessions*

Petitioner argues that his confession was false and not voluntary because it was induced by police tactics such as promises "that DNA would exonerate him and that he should just go along with the detectives for now," threats of harm to his mother, the long duration of the interview, and because he could not read or write.[55]

In order to determine whether a confession was given voluntarily, the court must look to what effect the totality of the circumstances had upon the will of the defendant.  Arizona v. Fulminante, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).  A voluntary confession cannot result from overreaching in the form of either direct or subtle psychological persuasion. United States v. Broussard, 80 F.3d 1025, 1034 (5th  Cir. 1996).  The defendant's mental condition of is a factor in the "voluntariness" determination, however,  "a defendant's mental condition, by itself and apart from its relation to official coercion" will not dispose of the inquiry. Sosa v. Dretke, 133 Fed.Appx. 114, 119 (5th Cir. 2005), *citing,* Colorado v. Connelly, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

The determination of whether the confession was obtained in accord with the Constitution is a matter of federal law, however, the state trial court's findings on the factual issues, including whether the police engaged in coercive tactics, are entitled to deference.  Miller v. Fenton, 474 U.S. 104, 110-17, 106 S.Ct. 445, 449-53, 88 L.Ed.2d 405 (1985); Dupuy v. Cain,

---

[54] Id. at pps. 604-605.

[55] Rec. Doc. 1 at p. 28.

41

201 F.3d 582, 588 (5th Cir. 2000), *cert. denied*, 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793

(2001); Barnes v. Johnson, 160 F.3d 218, 222 (5th Cir.1998), *cert. denied*, 526 U.S. 1118, 119

S.Ct. 1768, 143 L.Ed.2d 798 (1999); Muniz v. Johnson, 132 F.3d 214, 219 (5th Cir.1998), *cert.*

*denied*, 532 U.S. 1113 (1998).

As discussed above, the state courts denied petitioner's claim that his confessions were

not truthful or voluntarily given, finding that the police did not threaten or induce the

confessions.  A review of the record supports the state court's decision to deny petitioner's claim

that his confessions were not voluntary.  All of the officers involved testified that they did not

use any force or threats while interrogating petitioner.  In fact, although petitioner maintains that

the officer threatened his mother, his own testimony shows that it was not the officers who had

any involvement with his mother, but his in-laws.   The officers did not threaten to harm his

mother, but instead told petitioner that his in-laws were harassing his mother.   Moreover,

although petitioner argues that he confessed because the Detective Batiste had promised that if he

did so, the DNA evidence would exonerate him, there is no evidence of such a promise.

Petitioner fails to show that his confession was not truthful and voluntarily given.  On two

occasions, petitioner provided his account of the murder.  Petitioner's allegations of threats are

vague, at best.  Considering the foregoing, and giving deference to the state court's finding that

the police officers did not use coercive tactics to elicit petitioner's confessions, the undersigned

concludes that petitioner's claim is without merit.

### *Claim 3: Admission of confession into evidence*

Petitioner alleges that he was denied his Fifth Amendment rights because the

interrogating officer did not  honor petitioner's invocation of his Miranda rights.  Petitioner

42

contends that he told an interrogating officer he wanted an attorney, and that later, a second officer began speaking with him in violation of his rights under Miranda.

### Miranda warnings in general

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST., AMDT. 5.  The Clause bars the introduction at trial of involuntary confessions made in response to custodial interrogation.  The privilege against self-incrimination is enforced in part by the judicially-created Miranda-warning requirement. Miranda v. Arizona, 384 U.S. 386 (1966).  Miranda requires that during custodial interrogations, certain procedural safeguards be used to protect an individual's privilege against self-incrimination.[56]  Thus, where an accused is (1) in custody and (2) subject to interrogation, Miranda requires that he be advised of certain rights.  COOK, JOSEPH G., 3 Rights of the Accused, §6:14 (3rd Ed. 1996).  An individual must be warned before interrogation that (1) he has the right to remain silent; (2) that any thing he says can be used against him in a court of law; (3) that he has the right to the presence of an attorney; and (4) that if he cannot afford an attorney one will be appointed for him prior to any questioning if he desires.  Id. at 478-79.  The individual can

---

[56] Miranda  384 U.S. at 478.  The court held:

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

Id. at 444.

43

then waive those rights, but failure to advise the individual of these rights will result in the

exclusion at trial of any subsequent statements made by the individual at that interrogation.

In order for a confession obtained during a custodial interrogation to be admissible, the

defendant must have knowingly, voluntarily, and intelligently waived his <u>Miranda</u> rights.

<u>Miranda</u>, 384 U.S. at 479, 86 S.Ct. 1602.

### *Resumption of interrogation after invocation of rights*

In <u>Michigan v. Mosley</u>, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme

Court addressed the circumstances under which resumption of questioning is permissible after a

person in custody has indicated that he wishes to remain silent.  *See* <u>Mosley</u>, 423 U.S. at 100-02,

96 S.Ct. 321.  The Court ruled that "the admissibility of statements obtained after the person in

custody has decided to remain silent" must be determined by looking to the totality of

circumstances indicating whether the accused's " 'right to cut off questioning' was 'scrupulously

honored." ' <u>Id</u>. at 104.  In <u>Mosley</u>, the accused, after initial advice of rights, stated that he did not

wish to discuss certain robberies.  The police immediately ceased the interrogation and did not

attempt to resume questioning or otherwise persuade Mosley to reconsider his decision.  Two

hours later, a different officer approached Mosley and, after giving him full <u>Miranda</u> warnings,

inquired as to an unrelated murder.  The Court held that under these circumstances, no violation

of <u>Miranda</u> occurred.  Rejecting an interpretation of <u>Miranda</u> that would "create a *per se*

proscription of indefinite duration upon any further questioning by any police officer on any

subject, once the person in custody has indicated a desire to remain silent," the Supreme Court

concluded "that the admissibility of statements obtained after the person in custody has decided

44

to remain silent depends under <u>Miranda</u> on whether his 'right to cut off questioning' was 'scrupulously honored,' " <u>Mosley</u>, 423 U.S. at 102-104, 96 S.Ct. 321.

In <u>Mosley</u>, the Supreme Court set forth the following list of factors for a court to consider in making this inquiry:  (1) whether the police had given the suspect <u>Miranda</u> warnings at the first interrogation and the suspect acknowledged that he understood the warnings; (2) whether the police immediately ceased the interrogation when the suspect indicated that he did not want to answer questions; (3) whether the police resumed questioning the suspect only after the passage of a significant period of time; (4) whether the police provided a fresh set of <u>Miranda</u> warnings before the second interrogation; and (5) whether the second interrogation was restricted to a crime that had not been a subject of the earlier interrogation.  *See* <u>Mosley</u>, 423 U.S. at 104-07, 96 S.Ct. 321.

As discussed above, the state court determined that petitioner knowingly and voluntarily waived his <u>Miranda</u> rights and that he initiated the conversation with the officers that resulted in his confessions.  The state court's factual determinations are entitled to deference in this court.  A review of the testimony of Detectives Davitt and Batiste and Officer Boyd support the state court's determination that petitioner was advised of his <u>Miranda</u> rights, and that he waived his right to remain silent.

Accordingly, the totality of circumstances supports the state courts' conclusion that petitioner's inculpatory statements were admissible at trial.[57]  Nothing in the record indicates that

---

[57] Petitioner's case is factually distinguishable from <u>Mosley</u> in only one respect: in <u>Mosley</u>, the two interrogations concerned different crimes, whereas in petitioner's case, the officers discussed the same crime.  This distinction is of no constitutional significance, however.  As the Eighth Circuit noted in <u>Stumes v. Solem</u>, 752 F.2d 317, 322 (8th  Cir.1985), "Questioning

45

the police "persist[ed] in repeated efforts to wear down [Dugas's] resistance and made him change his mind." Mosley, 423 U.S. at 105-06, 96 S.Ct. at 327.  The record shows that petitioner's right to cut off questioning was scrupulously honored, and that after a significant period of time, petitioner began to speak to a second officer after once again waiving his Miranda rights.

Petitioner has failed to demonstrate that the state courts' decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or that the decision constitutes an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* §2254. Accordingly, it is recommended that this claim be denied.

### Claim 5:  Sufficiency of the evidence

Petitioner argues that the evidence adduced at trial does not support a verdict of second degree murder.

The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  Jackson v. Virginia, 443

---

about the same crime does not of itself prove bad faith or undue pressure on the part of the police...." *Accord* Kelly v.. Lynaugh, 862 F.2d 1126, 1131 (5th Cir.1988) (holding "it is not decisive that the interrogations covered the same crime");  Brown v. Caspari, 186 F.3d 1011, 1015 (8th Cir.1999) ("[A] second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview"); United States v. Wyatt, 179 F.3d 532, 538 (7th Cir.1999) (rejecting the argument that Mosley requires authorities "to restrict reinterrogation to crimes unrelated to any offenses that a suspect has earlier refused to discuss"); Grooms v. Keeney, 826 F.2d 883, 886 (9th Cir.1987) ("[T]he fact that a subsequent interrogation pertains to the same crime is not important").

46

U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  A jury's determination of witness credibility,

the inferences made on the evidence, and the jury's reasonable construction of the evidence is

entitled to great deference by a reviewing court.  See Marshall v. Lonberger, 459 U.S. 422,

433-35, 103 S.Ct. 843, 850-51, 74 L.Ed.2d 646 (1983), United States v. Chaney, 964 F.2d 437,

448 (5th Cir.1992), United States v. Hatch, 926 F.2d 387, 392-93 (5th Cir.1991).  In addition,

where there has been a thoughtful review of the sufficiency of the evidence by a state appellate

court, that court's findings are entitled to great weight. Jackson, 443 U.S. at 322 n.15, 99 S.Ct. at

2790 n.15.

The Louisiana Third Circuit Court of Appeals reviewed petitioner's claim of insufficiency

of evidence and rejected it:

> As mentioned above, the Defendant argues that without the confessions, there was
> no direct evidence linking him to the crime.  Because there was initially an
> indication that she may have been raped, the victim's comforter was collected as
> evidence. Katherine Cross, a forensic DNA analyst with the Acadiana Crime
> Laboratory, testified that she found semen stains on the comforter; however, the
> DNA did not match the Defendant's DNA.  She further testified that there was not
> evidence of the victim's blood on any of the Defendant's clothes taken form the
> washing machine or in the wash water.  Finally, the object which inflicted the
> wounds to the victim's head was never located.
>
> Even without this forensic evidence, there is ample evidence to support the
> conviction for second degree murder beyond a reasonable doubt.  Two witnesses
> testified that they heard the Defendant make threatening statements to the victim
> on the evening before the killing.  There was testimony that the Defendant was
> angry because his wife, the victim's sister, moved from Breaux Bridge with his
> two children and that he was angry with the victim for helping her move.  There
> was testimony that he was planning to kill someone.  Additional testimony
> established that the Defendant sent the victim's brother out of the trailer to
> purchase cigarettes at two in the morning and that Defendant was the last person
> to see her alive.  Finally, the Defendant confessed that he inflicted the injuries
> which resulted in the victim's death.  Defendant told Detective Batiste that, after
> the victim indicated to him that he would never see his children again and refused
> to help him in that endeavor, he struck the victim twice with an object.  The

47

Defendant confessed a second time to Detective Boyd three days later.  Doctor
Laga testified that the victim was struck three or more times on the side of the
head and died as a result fo those blows.   'Once proof independent of the
confession confirms the fact of death by violent means, the confession alone can
supply the proof linking the accused to the crime."  State v. Bryant, 29,344, p. 4
(La. App. 2 Cir. 5/7/97); 694 So.2d 556, 559.

The Defendant argues that without the confessions, the remaining evidence was
circumstantial and that the State failed to exclude the reasonably hypothesis of
innocence.  However, we need not discuss the sufficiency of the evidence without
the confessions because ... the Defendant's confessions were voluntary and freely
made.  Therefore, this claim is without merit.

The Defendant asserts in the alternative, that should this court find that the State
met its burden of proof, manslaughter was the appropriate verdict under the facts
of the case.

***

As outlined above, however, there was ample testimony that the Defendant had
planned some retaliatory action at least a week in advance of the killing.  Two
separate witnesses reported that hours before the killing, the Defendant made
threatening statements to the victim.  There was testimony that the Defendant,
after learning neither the victim nor her brother had cigarettes, borrowed money,
and convinced the victim's brother to go out at two o'clock in the morning to
purchase cigarettes.  The requisite intent may be inferred from the circumstances
and actions of the accused.

***

There was sufficient evidence presented at trial to convince a rational trier of fact
that the State proved beyond a reasonable doubt the Defendant struck the victim
several times with an object hard enough to kill her and that he had the specific
intent to do so at the time he struck the blows.  Accordingly, there was sufficient
evidence to support the Defendant's conviction for the crime of second degree
murder.[58]

Petitioner argues that there was insufficient evidence that he had committed second

degree murder because without his confessions, "the State's case rested on weak circumstantial

---

[58]  Exhibit to Rec. Doc. 13 at pp. 596-598.

48

evidence which at best proved that Harry Dugas was with the victim at Cora's Bar and at her home on the night of the murder and that threats had been made."[59]  As discussed above, petitioner's confessions were properly admitted into evidence.  Even with the confessions, petitioner argues that at best, the state could prove only manslaughter and not second degree murder because the victim provoked him.

As discussed above, trial testimony established that petitioner was upset with the victim because she had helped his wife leave town with his children.  A week or two before the crime, petitioner had told a witness that he planned on killing someone because of his frustration.  Two witnesses testified that on the night of the murder, they heard petitioner threaten to kill the victim.  Petitioner confessed to becoming angry with the victim and killing her by hitting her in the head.

Considering the foregoing, viewing the evidence and the inferences that my be drawn from it in the light most favorable to the verdict, I find that a rational jury could have found that the essential elements of the crime of second degree murder were proven beyond a reasonable doubt.  Further, the decision by the appellate court denying petitioner's claim that there was insufficient evidence to support the conviction was neither contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, I find that petitioner's claim is without merit and should be denied.

### *Claim 7: Request for DNA testing and an independent investigation*

Petitioner argues that the trial court erred in denying his post-conviction claim requesting DNA testing.  Petitioner also argues that this court should order DNA testing and conduct and

---

[59] Rec. Doc. 1 at p. 55.

49

independent investigation into this crime.  Petitioner argues that the testing and investigation

would show that another person committed the crime.  Petitioner argues:

> The biological sample to be tested is the victim panties in the area that the
> perpetrator would have pulled them from the victim.  And the fingernail
> scrapings, for an unknown DNA profile.  Any hair samples found on the body not
> belonging to the victim.  Swabs from the victim's vagina for DNA traces.  Mr.
> Dugas believes the remaining evidence is in the possession of the District
> Attorney, and would move this court for an order to require the state to preserve
> this evidence and produce it at the time and place that testing is order.[60]

Petitioner raised this claim on post-conviction application.  The trial court denied the

claim:

> Mr. Dugas claims that additional DNA testing would prove his innocence.  The
> additional DNA testing requested by Mr. Dugas includes comparing the DNA
> found on the victim's comforter to DNA samples of other possible suspects.
> Further, Mr. Dugas requests a DNA analysis of the victim's panties, vaginal swab,
> hair fibers and fingernails.
>
> DNA testing was done on October 10,2 998.  The DNA testing included
> comparisons of Mr. Dugas' DNA with seminal stains on the comforter of the
> victim.  The conclusions revealed that Mr. Dugas was not the sperm donor of one
> of the samples found on the comforter.  However, many other samples could not
> be tested due to the lack of epthelial cells adequate for DNA analysis.  Many of
> the samples requested by Mr. Dugas in this application could not be completed
> due to the lack of epithelial cells adequate for DNA analysis.
>
> Mr. Dugas' main defense at trial was that Jerry Williams, the victim's live-in
> boyfriend, committed the murder.  Mr. Dugas contends that the additional DNA
> testing would prove his innocence by showing that Mr. Williams' DNA was
> present in the samples.  Even if Mr. Williams' DNA was present, it would not
> help Mr. Dugas' defense, as one would expect to find Mr. Williams' DNA on
> objects in the trailer where he had been living with the victim.[61]

---

[60] Rec. Doc. 1 at p. 48.

[61] Exhibit to Rec. Doc. 13 at p. 778-779.

50

Federal habeas relief is not available for attacking claims regarding the state post-conviction process.  Such a "claim fails because infirmities in state habeas proceedings do not constitute grounds for relief in federal court." Hallmark v. Johnson, 118 F.3d 1073, 1080 (5th Cir.), *cert. denied*, Johnson v. Monroe, 522 U.S. 1003, 118 S.Ct. 576, 139 L.Ed.2d 415 (1997); *see* Nichols v. Scott, 69 F.3d 1255, 1275 (5th Cir.1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself."); Duff-Smith v. Collins, 973 F.2d 1175, 1182 (5th Cir.1992); Millard v. Lynaugh, 810 F.2d 1403, 1410 (5th Cir.1987); Vail v. Procunier, 747 F.2d 277, 277 (5th Cir.1984) (denying petitioner a certificate of probable cause because "[i]nfirmities in state habeas corpus proceedings do not constitute grounds for federal habeas relief").  Thus, insofar as petitioner argues that the trial court erred in denying his post-conviction application for DNA testing, that claim is not cognizable in this *habeas* proceeding.

With regard to petitioner's request that this court order DNA testing and an independent investigation, the undersigned concludes that petitioner fails to present any evidence indicating that he was wrongly convicted or that additional testing and investigation will support his claims of innocence.  Although petitioner argues that additional DNA testing may show that either the victim's brother or boyfriend's DNA was found around the crime scene, such evidence does not affect the finding regarding petitioner's guilt – those men lived with the victim and their DNA could reasonably be expected to be in the home.

More importantly, the foregoing analysis of petitioner's claims shows that he has attacked virtually every aspect of his case, yet no constitutional violations have been proven.  The voluminous record has been reviewed and the undersigned has found that counsel was effective,

petitioner's confessions were properly admitted into evidence, and there was sufficient evidence to prove that petitioner committed second degree murder.  Considering the overwhelming evidence of petitioner's guilt and because the requested DNA testing would not necessarily benefit petitioner, the undersigned concludes that petitioner's request should be denied.

*Conclusion*

For the foregoing reasons, **IT IS RECOMMENDED** that petitioner's claims be **DENIED** and **DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See* Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on May 7, 2007.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)